# EXHIBIT T



## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 1, 2010, is made and entered into by and among SJK SPECIAL OPPORTUNITIES FUND, LP, a North Carolina limited partnership ("Purchaser"), T&B SPORTS PERFORMANCE, LLC, a North Carolina limited liability company ("Seller"), and MARK TROUTMAN, a citizen and resident of the State of North Carolina ("Troutman," and along with Purchaser and Seller collectively the "Parties" and each a "Party").

## WITNESSETH:

WHEREAS, Seller is the sole holder of all legal and beneficial title in and to the Franchise Rights, the Assets, and the Leasehold Interests (each as defined below) and desires to sell same to Purchaser, and Purchaser desires to purchase same from Seller, each in accordance with this Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Purchaser and Seller hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

1.1    Definitions.

As used herein, the following terms shall have the meanings set forth in this Article:

a.    "Accounts" means all accounts receivable of the Seller in existence at the Closing, including, without limitation, those accounts receivable set forth on Schedule 1.1(a) attached hereto to the extent still outstanding as of the Closing.

b.    "Assets" means all of Seller's right, title and interest in all properties, assets, and rights of any kind, whether tangible or intangible, real or personal, owned, licensed, leased, by Seller in connection with or incidental to the operation of the Business or otherwise, including without limitation, all, Accounts, instruments, equipment, furniture, fixtures, Franchise Rights, leasehold improvements, Inventory, supplies, Records, goodwill, Contracts, licenses, permits, approvals, authorizations, rights, insurance claims and insurance proceeds (unless such claims arise solely in connection with an Excluded Asset) but excluding those Excluded Assets described in Section 1.3 hereof.  A list of all known Assets is set forth as Schedule 1.1(b) attached hereto solely for illustrative purposes and not by way of limitation, it being the intention of the Seller to convey all of its owned, licensed, or leased assets that in any way relate to the operation of the Business, whether or not listed on Schedule 1.1(b), other than Excluded Assets. Without limiting the foregoing, the Assets shall include such Contracts of the Seller as Purchaser shall designate for assumption and assignment provided however, that such assumption and assignment shall be subject to determination of the amount necessary to cure any defaults under

such Contracts and to a determination of the method for curing such defaults.  Seller shall be solely responsible for payment of such cure amounts from the proceeds of this transaction.

c.  "Business" means all business operations of Seller pertaining to Seller's Franchise Rights.

d.  "Closing" means the consummation of the purchase and sale of the Assets pursuant to this Agreement.

e.  "Closing Date" means the date of the Closing.

f.  "Contracts" means all of Seller's rights in and under all agreements, contracts, and licenses (whether purchase, sale, or otherwise) affecting or involving the operation of the Business.  A complete list of all known material Contracts is listed on Schedule 1.1(f) attached hereto, solely for illustrative purposes and not by way of limitation

g.  "Franchise Rights" means all of Seller's right, title, and interest in all franchise rights granted to Seller by Velocity Sports Performance Franchise Systems, LLC ("Velocity") and/or any affiliate of Velocity pursuant to that certain franchise agreement between Seller and Velocity dated on or about November 27, 2003, as amended any and all franchise agreements the following franchise agreements (the "Franchise Agreement").

h.  "Inventory" means all of the stock in trade, supplies, and inventory used or useful in the operation of the Business, including without limitation, the inventory listed in Schedule 1.1(h) attached hereto and incorporated herein by reference, but not including any inventory used or sold prior to the Closing in the ordinary course of the Business.

i.  "Leasehold Interests" means all of Seller's rights and obligations in and under all real and personal property lease agreements, including, without limitation, Seller's lease rights and obligations pertaining to that certain lease between Seller, as tenant, and Highwoods Realty Limited Partnership, as landlord, dated on or about April 7, 2004 (the "Highwoods Lease").

j.  "Records": All customer, inventory, billing and supply records, product information, product drawings, production documentation, material specifications, equipment lists, formulae, specifications, plans, reports, data, notes, correspondence, marketing and production material, files, instruction or maintenance manuals for equipment, and all other books and records relating to the operation of the Business.

k.  "To the knowledge of Seller": The actual knowledge of any one or more of the following: (i) Seller; and/or (ii) Mark Troutman ("Troutman").

### 1.2   Purchase and Sale.

Subject to the terms and conditions set forth herein, on the Closing Date, Seller shall sell and deliver to Purchaser, and Purchaser shall purchase from Seller, the Assets, free and clear of any and all liens, claims, encumbrances or interests.

### 1.3   Excluded Assets.

The Assets shall not include any of the following (collectively, the "Excluded Assets"):

a.     Cash and cash equivalents (other than Accounts).

b.     Seller's organizational documents.

c.     Such other assets as are identified in Schedule 1.3(c) attached hereto and incorporated herein by reference ("Other Excluded Assets").

### 1.4   Assignment and Assumption of Liabilities.

Except as may be expressly stated otherwise herein, Purchaser shall not assume any liability or obligation of Seller, and Seller shall remain fully liable and responsible for its liabilities and obligations. Except as may be expressly stated otherwise herein, Seller shall not assume any liability or obligation of Purchaser, and Purchaser shall remain fully liable and responsible for its liabilities and obligations.

### 1.5   Purchase Price.

The purchase price for the Assets (the "Purchase Price") is Two Hundred Thousand Dollars ($200,000.00), payable in full in cash or other immediately available funds at Closing.

### 1.6   Closing.

The Closing shall occur not later than November 1, 2010, unless otherwise mutually agreed in writing by the Parties, after which date.

### 1.7   Allocation of Purchase Price.

The Purchase Price shall be allocated to the Assets in accordance with Schedule 1.7 to be provided at or before the Closing Date ("Purchase Price Allocation").

## ARTICLE II
## REPRESENTATIONS, WARRANTIES, AND COVENANTS

### 2.1   Of Seller.

In addition to any and all other representations, warranties, and covenants of Seller contained in this Agreement, Seller and Troutman, jointly and severally, hereby represent,

warrant, and covenant to Purchaser that as of the date hereof and as of the Closing Date each of the following statements is and shall be true and correct in all material respects:

a.      Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of North Carolina. Seller has full corporate power to execute and deliver this Agreement and to perform its obligations hereunder, to own, lease and operate its properties, and to carry on its business as now being conducted, including without limitation the Business. Seller is duly qualified to do business and is in good standing in each jurisdiction in which such qualification is necessary because of the property owned, leased or operated by it or because of the nature of its business as now being conducted.

b.      This Agreement has been duly authorized, executed and delivered by Seller and is the valid and binding obligation of Seller.  This Agreement is enforceable against Seller in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

c.      Neither the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Seller nor compliance by Seller with any of the provisions hereof (as well as all other instruments, agreements, certificates or other documents contemplated hereby) will: (i) conflict with or result in a breach of, or require any consent or approval under, the charter, by-laws, or other constitutive documents, as applicable, of Seller; (ii) give rise to any right of termination, cancellation, acceleration, or modification under any of the provisions of any material contract, agreement or other instrument to which Seller is a party; (iii) to the knowledge of Seller violate any law, statute, rule, regulation or order; (iv) violate any writ, injunction or decree applicable to Seller or the properties or assets of Party, including without limitation the Assets; or (v) result in the creation or imposition of any security interests, liens, pledges, charges, escrows, options, rights of first refusal, mortgages, indentures, security agreements or other encumbrances with respect to any of the Assets. Except as set forth in Schedule 2.1(c) ("Third Party Consents"), no consent or approval by, or any notification of or filing with, any third party or governmental authority is required in connection with the execution, delivery and performance by such party of this Agreement or the consummation of the transactions contemplated hereby.

d.      Since January 1, 2009, there has not been any damage, destruction or loss (whether or not covered by insurance) affecting any Asset or property of Seller that is materially adverse to the conduct of the Business.

e.      Seller will deliver to Purchaser at Closing good legal and equitable title to all personal property Assets and good record title to all Leasehold Interests, in each case free and clear of all liens, claims, and encumbrances. The Assets are suitable for the purposes for which they are now being used, and, together with the Excluded Assets, constitute all of the properties, assets, interests and rights (not including employees or non-transferable governmental or regulatory approvals) necessary, appropriate, used or useful to operate the Business.

f.      Seller has delivered to Purchaser true, complete, and correct copies of executory contracts to which Seller is a party and which are material to the Business.

g.      Except as set forth on Schedule 2.1(g) ("Permits and Licenses"), no federal, state, or local governmental licenses or permits necessary or material to conduct the Business.  To the extent that any federal state, local governmental license is necessary or material to conduct the Business, Seller possesses same and has possessed same without revocation or suspension for so long as Seller has operated the Business.

h.      Seller has not received any prepayment for services to be performed or goods to be delivered by Purchaser after the Closing Date save and except customer prepayments made during the period of thirty (30) days prior to the Closing, which prepayments the Parties agree Seller may retain for its own account.

i.      No agent, broker, investment banker or any other Person acting on behalf of or under the authority of Seller is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly from any of the parties hereto in connection with any of the transactions contemplated hereby, and in no event shall Purchaser be obligated to pay such Person.

j.      Troutman holds all legal and beneficial title in and to all issued and outstanding membership interests of Seller and is the only manager of Seller.

k.      The foregoing representations, warranties, and covenants shall survive the Closing.

2.2     Of Purchaser.

In addition to any and all other representations, warranties, and covenants of Purchaser contained in this Agreement, Purchaser hereby represents, warrants, and covenants to Seller that as of the date hereof and as of the Closing Date each of the following statements is and shall be true and correct in all material respects:

a.      Purchaser is a limited partnership duly organized, validly existing and in good standing under the laws of the State of North Carolina. Purchaser has full corporate power to execute and deliver this Agreement and to perform its obligations hereunder, to own, lease and operate its properties, and to carry on its business as now being conducted. Purchaser is duly qualified to do business and is in good standing in each jurisdiction in which such qualification is necessary because of the property owned, leased or operated by it or because of the nature of its business as now being conducted.

b.      This Agreement has been duly authorized, executed and delivered by Purchaser and is the valid and binding obligation of Purchaser.  This Agreement is enforceable against Purchaser in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

c.     Neither the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Purchaser nor compliance by Purchaser with any of the provisions hereof (as well as all other instruments, agreements, certificates or other documents contemplated hereby) will: (i) conflict with or result in a breach of, or require any consent or approval under, the charter, by-laws, or other constitutive documents, as applicable, of Purchaser; (ii) give rise to any right of termination, cancellation, acceleration, or modification under any of the provisions of any material contract, agreement or other instrument to which Purchaser is a party; (iii) to the knowledge of Purchaser violate any law, statute, rule, regulation or order; or (iv) violate any writ, injunction or decree applicable to Seller or the properties or assets of Party, including without limitation the Assets.

d.     No agent, broker, investment banker or any other Person acting on behalf of or under the authority of Purchaser is or will be entitled to any broker's or finder's fee or any other commission or similar fee directly or indirectly from any of the parties hereto in connection with any of the transactions contemplated hereby, and in no event shall Seller be obligated to pay such Person.

e.     The foregoing representations, warranties, and covenants shall survive the Closing.

## ARTICLE III
## ADDITIONAL AGREEMENTS

3.1     <u>Expenses.</u>

Each Party shall bear its own costs and expenses incurred in connection with the transactions contemplated by this Agreement.

3.2     <u>Preservation of Assets.</u>

From the date hereof until the earlier of the termination of this Agreement or the Closing Date, Seller shall preserve the material Assets in good operating condition and shall operate the Business in the ordinary course of business.

3.3     <u>Further Assurances.</u>

Each of the Parties hereto agrees to use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations, to consummate and make effective the transactions contemplated by this Agreement as expeditiously as practicable. Without limiting the foregoing, Seller shall execute and deliver such affidavits and other documents as may reasonably be requested by Purchaser solely for purposes of obtaining a title or other insurance policy satisfactory to Purchaser.

3.4     <u>Access and Information.</u>

From the date hereof until the earliest of the Closing Date and the date of termination of this Agreement, Seller shall continue to permit Purchaser and its agents and representatives

(including without limitation their lenders and financial advisors) to have access to Seller, its affiliates and subsidiaries, if any, and their respective officers, counsel, auditors, books and records, and the opportunity to investigate Seller, its affiliates and the property and the condition and nature of their assets, business and liabilities, in each case upon reasonable notice and during normal business hours. If, during such investigation, Purchaser identifies facts or conditions that are unacceptable to Purchaser then shall have the right, by written notice delivered to Seller, terminate this Agreement.

3.5     Employees.

      a.     Purchaser shall not be obligated hereby to offer employment to any employee of Seller. During the period prior to the Closing, Seller shall make available to Purchaser for interviews such employees as Purchaser may designate, subject to the interest of any such employee to be interviewed.

      b.     Notwithstanding the foregoing or any other provision in this Agreement, Purchaser agrees to offer employment to Troutman, such employment to be governed by the employment agreement attached hereto as Schedule 3.5(b) and incorporated herein by reference (the "Employment Agreement") effective as of the Closing.

ARTICLE IV<br>CLOSING

4.1     Conditions to Obligations of Purchaser.

      The obligations of Purchaser to perform hereunder and at the Closing are subject to the satisfaction, at or prior to the Closing, of the following conditions, unless waived by Purchaser in writing:

      a.     No action, suit or proceeding shall be pending to enjoin, restrain or prohibit the transactions contemplated hereby, or that would be reasonably likely to prevent or make illegal the transactions contemplated hereby.

      b.     All representations and warranties of any Seller and/or Troutman shall be true and correct in all respects, and Seller shall have performed and complied in all material respects with all covenants, obligations, and agreements required to be performed or complied with by Seller on or prior to the Closing Date.

      c.     Seller shall be ready, willing and able to deliver to Purchaser the Seller's Closing Deliveries.

      d.     No injunction or orders issued by a court of competent jurisdiction that prohibits the consummation of the transactions contemplated herein shall be in effect.

      e.     Seller shall have received and delivered to Purchaser all consents, if any, that are required for the consummation of the Closing.

f.      Purchaser shall have entered into lease and/or sublease agreements satisfactory to Purchaser pertaining to the premises that are the subject of the Highwoods Lease.

g.      Purchaser shall have received consent from Velocity Sports to Purchaser's acquisition of the Franchise Rights and Purchaser shall otherwise have mutually entered into such agreements with Velocity Sports as Purchaser deems necessary in order for Purchaser to own and operate a Velocity Sports franchise at such locations and upon such terms as are acceptable to Purchaser in its sole discretion. Seller shall have paid in full, or received a waiver of, any and all fees payable to Velocity Sports with respect to the transfer of the Franchise Rights from Seller to Purchaser.

h.      Seller shall have delivered to Purchase resolutions, satisfactory to Purchaser, of Seller's members authorizing the transactions contemplated by this Agreement.

4.2     Conditions to Obligations of Seller.

The obligations of Seller to perform hereunder and at the Closing are subject to the satisfaction, at or prior to the Closing, of the following conditions, unless waived by Seller in writing:

a.      No action, suit or proceeding shall be pending to enjoin, restrain or prohibit the transactions contemplated hereby, or that would be reasonably likely to prevent or make illegal the transactions contemplated hereby.

b.      All representations and warranties of Purchaser shall be true and correct in all respects, and Purchaser shall have performed and complied in all material respects with all covenants, obligations, and agreements required to be performed or complied with by Purchaser on or prior to the Closing Date.

c.      Purchaser shall be ready, willing and able to deliver to Purchaser the Purchaser's Closing Deliveries.

d.      No injunction or orders issued by a court of competent jurisdiction that prohibits the consummation of the transactions contemplated herein shall be in effect.

e.      Purchaser shall have received and delivered to Seller all consents, if any, that are required for the consummation of the Closing.

4.3     Deliveries at Closing.

a.      At the Closing, Seller shall deliver or cause the delivery of the following to Purchaser (collectively, "Seller's Closing Deliveries"):

i.      A bill of sale in the form of Schedule 4.3(a)(i) attached hereto and incorporated herein by reference (the "Bill of Sale"), duly executed by Seller.

ii.     An assignment and assumption agreement in the form of <u>Schedule 4.3(a)(ii)</u> attached hereto and incorporated herein by reference (the "<u>Assignment and Assumption Agreement</u>"), duly executed by Seller.

iii.    The Employment Agreement, duly executed by Troutman.

iv.  .   Such other agreements, documents, and instruments as Purchaser may reasonably request in order to consummate the transactions contemplated by this Agreement.

b.     At the Closing, Purchaser shall deliver or cause the delivery of the following to Purchaser (collectively, "<u>Purchaser's Closing Deliveries</u>"):

i.     · The Purchase Price.

ii.     The Employment Agreement, duly executed by Purchaser.

iii.    The Assignment and Assumption Agreement, duly executed by Purchaser.

iv.     Such other agreements, documents, and instruments as Seller may reasonably request in order to consummate the transactions contemplated by this Agreement.

4.4     <u>Closing Date Pro Rated Amounts</u>.

At the Closing, Purchaser and Seller shall equitably pro rate, as of the Closing, the following: (a) payments made in respect of the Assets and/or the Business by Seller prior to the Closing the benefit of which shall be received by Purchaser after the Closing; and (b) payments to be made in respect of the Assets and/or the Business after the Closing by Purchaser the benefit of which was received by Seller prior to the Closing.

### ARTICLE V
### INDEMNIFICATION

5.1     <u>Of Purchaser</u>.

Seller and Troutman, jointly and severally, hereby agree to indemnify, defend, and hold harmless Purchaser and Purchaser's partners, officers, employees, and authorized representatives, and their respective heirs, successors, and assigns, from and against any and all liabilities, damages, awards, claims, judgments, losses, and expenses (including without limitation reasonable attorneys' fees actually incurred) arising with respect to any one or more of the following: (a) any representation and/or warranty made by Seller and/or Troutman in this Agreement and/or in any agreement, document, or instrument delivered or to be delivered pursuant to this Agreement; and/or (b) a breach by Seller of this Agreement and/or of any agreement, document, or instrument delivered or to be delivered pursuant to this Agreement.

5.2    Of Seller.

Purchaser hereby agrees to indemnify, defend, and hold harmless Seller and Seller's members, managers, officers, employees, and authorized representatives, and their respective heirs, successors, and assigns, from and against any and all liabilities, damages, awards, claims, judgments, losses, and expenses (including without limitation reasonable attorneys' fees actually incurred) arising with respect to any one or more of the following: (a) any representation and/or warranty made by Purchaser in this Agreement and/or in any agreement, document, or instrument delivered or to be delivered pursuant to this Agreement; and/or (b) a breach by Purchaser of this Agreement and/or of any agreement, document, or instrument delivered or to be delivered pursuant to this Agreement.

ARTICLE VI
MISCELLANEOUS

6.1    Entire Agreement.

This Agreement and its schedules contain the entire agreement and understanding among Parties with respect to the subject matter hereof and supersedes any and all prior agreements or understandings among the Parties with respect to such subject matter.

6.2    Notices.

All notices, requests and other communications to any Party with respect to this Agreement shall be in writing and sufficient if delivered personally or sent by facsimile transmission (with confirmation of receipt) or by overnight delivery service maintaining records of receipt, addressed as follows:

If to Purchaser, to:

SJK Special Opportunities Fund, LP
303 Pisgah Church Road
Suite 2-C
Greensboro, NC 27455
Attention: Stan Kowalewski

If to Seller and/or Troutman, to:

Mark Troutman
724 Florham Dr
High Point, NC 27262

or to such other address or telecopy number as the party to whom notice is to be given may have furnished to the other parties in writing in accordance herewith. Each such notice, request or communication shall be effective when received at the address specified in this Section 6.2.

6.3    Counterparts, Facsimile Transmission.

This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which counterparts collectively shall constitute one instrument. Signatures sent to the other Parties by facsimile transmission shall be binding as evidence of acceptance of the terms hereof by such signatory party.

6.4    Survival.

All the provisions of this Agreement that contemplate performance after the Closing shall survive the Closing.

6.5    Amendments and Waivers.

No modification, amendment or waiver, of any provision of, or consent required by this Agreement, nor any consent to any departure herefrom, shall be effective unless it is in writing and signed by all Parties.

6.6    Assignment.

This Agreement and the rights and obligations hereunder shall not be assignable or transferable by any Party without the prior written consent of the other Parties.

6.7    Governing Law.

The rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to provisions or procedures regarding conflicts of law.

6.8    Severance.

Should any provision of this Agreement be deemed unenforceable by a court of competent jurisdiction, such provision shall be deemed severed and the remainder of this Agreement shall remain in full force and effect notwithstanding such severance.

6.9    Construction.

This Agreement shall be construed as if mutually drafted by all Parties.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above-written.

SJK Special Opportunities Fund, LP

By: _Sey K~1_____
Name: _Stan Kovalewski_____
Title: _General Partner_____

T&B Sports Performance, LLC

By: _Mark Troutman_____
Name: _MARK Troutman_____
Title: _Business Manager_____

_Mark Troutman_____
Mark Troutman

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Accounts |
| Schedule 1.1(b) | Assets |
| Schedule 1.1(f) | Contracts |
| Schedule 1.1(h) | Inventory |
| Schedule 1.3(c) | Other Excluded Assets |
| Schedule 1.7 | Purchase Price Allocation |
| Schedule 2.1(c) | Third Party Consents |
| Schedule 2.1(g) | Permits and Licenses |
| Schedule 3.5(b) | Employment Agreement |
| Schedule 4.3(a)(i) | Bill of Sale |
| Schedule 4.3(a)(iv) | Assignment and Assumption Agreement |

Schedule 1.1(a)
Accounts


Accounts-
All clients information from Mind Body Online and Constant Contact

Schedule 1.1(b)
Assets


All training equipment including 3 platforms, 3 racks, two towers, weights, medicine balls, hurdles, plyometric boxes, 2 vertimax machines ,3 slide boards and all speed equipment (ladders, hurdles, etc).

All office furniture including 2 desktop computers, 2 laptop computers and flat screen TV

Video camera and Dartfish Video Technology

All office supplies
(See list from tax return depreciation.)

Schedule 1.1(f)

Contracts

Highwoods Realty
Mind Body Online scheduling system
Constant Contact
Direct TV
AT and T phone and internet service
Duke Power
Piedmont Natural Gas
Philadelphia Insurance- General Liability Insurance
Hartford Insurance- Workman's Comp insurance
Sublease with Advanced Therapy thru Dec 31, 2010

Schedule 1.1(h)

Inventory


Velocity logoed apparel
Gatorade powder, cups and coolers

Schedule 1.3(c)                         Other Excluded Assets


**T and B Bank Account**
**Troutman Tennis apparel**
**Highwoods Realty down payment**
**Pro rated portion of GL insurance and Workman's comp insurance**

Schedule 1.8

Purchase Price Allocation

Schedule 2.1(c)
Third Party Consents

1.    Velocity Sports Performance Franchise Systems, LLC

2.    Highwoods Realty Limited Partnership

### Schedule 2.1(g)
### Permits and Licenses

City of Greensboro business license

Schedule 3.5(b)
Employment Agreement

See attachment hereto.

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "Agreement") is effective as of September 1, 2010, by and between SJK Investment Management LLC (the "Employer") and Mark Troutman (the "Employee") (collectively, the "Parties").

1. **Employment.** The Employer hereby agrees to employ the Employee as a Managing Director of Velocity Sports Performance on behalf of SJK Special Opportunities Fund, LP, and the Employee agrees to be employed by the Employer on the terms and conditions hereinafter set forth.

2. **Term.** The Employee's term of employment hereunder shall commence on the effective date of this Agreement and shall extend through August 31, 2011 (the "Initial Term"). The term of the Employee's employment hereunder automatically shall renew for successive one (1) year renewal periods following the Initial Term unless sooner terminated pursuant to Section 7 below or unless either party to the Agreement provides notice to the other party, at least 90 days prior to the end of the Initial Term or any subsequent one (1) year renewal period, that the Employee's term of employment hereunder shall terminate at the end of the Initial Term or any such subsequent one (1) year renewal period. The Initial Term together with all subsequent one (1) year renewal periods, if any, collectively are referred to herein as the "Employment Period."

3. **Compensation.**

   (a) **Base Salary.** In consideration of the performance of duties hereunder, the Employee shall be entitled to receive during the Employment Period an annual base salary of fifty thousand dollars ($50,000). The Employee shall be paid the base salary during the Employment Period in accordance with the Employer's regular payroll practices with respect to senior management compensation, but not less frequently than monthly. The Executive Committee shall review the Employee's performance at least once each year during the Employment Period, and, acting in its sole discretion, shall determine whether to grant any increase in the rate of the Employee's base salary for future years during the Employment Period. All payments made to or on behalf of the Employee under the terms of this Agreement, including without limitation all payments of base salary and any commissions and bonuses, shall be subject to all withholding required or permitted by law (such as federal, state and local income and payroll taxes) and such additional withholding as may be agreed upon by the Employee.

   (b) **Incentive Compensation.**
   (i) With respect to each calendar year of the Employer ending within the Employment Period, the Employee shall be entitled to the payment of incentive compensation that will be drawn from the Employer's Earnings Before Interest and Taxes ("EBIT"), which will be calculated in accordance with generally accepted accounting principles. The amount of incentive compensation that Employee shall be entitled to receive ("Incentive Compensation") an amount equal to 10% of the net profits of the Velocity Sports Performance that is operated by the Employer.

   (ii) The payment of all Incentive Compensation shall be made in accordance with the Employer's regular payroll practices. In the event that the Employee's employment with the Employer terminates prior to the end of any calendar year of the Employer for any reason other than Cause (as defined in Section 7(c) below), the Employee shall be paid pro-rata Incentive Compensation amounts, which shall be calculated by multiplying the amount of the Incentive Compensation the Employee otherwise would have been paid had he remained employed with the Employer through the end of such calendar year by a fraction, the numerator of which shall be the number of days in the calendar year prior to the Employee's termination and the denominator of which shall be 365. Any Incentive Compensation earned by the Employee pursuant to this Section 3(b) shall be paid to the Employee in the form of lump sum cash payments.

   (c) **Business Related Expenses.** During the Employment Period, the Employee may incur reasonable expenses for promoting the Employer's business, including reasonable expenses for entertainment, travel and similar items. The Employer shall reimburse the Employee for all such expenses upon the

Employee's periodic presentation of an itemized account of such expenditures and in accordance with the policies and procedures of the Employer. Such expenses will serve to reduce the Employer's EBIT.

(d) **Benefits.** The Employee shall be eligible to participate in any health insurance and 401-K benefit plan or plans as the Employer may make available generally to its employees and other individuals serving in comparable positions. The Employee voluntarily assumes the cost of the coverage in excess of that covered by the Employer. The Employee shall aid the Employer in procuring insurance for the Employee by submitting to the usual and customary medical examinations and by promptly completing, executing, and delivering such applications and other instruments in writing as may be reasonably required by any insurance company or companies.

(e) **Disability Benefit.** In the event of the Permanent and Total Disability of the Employee (as defined in Section 7(b) below), the Employer shall pay the Employee his base salary for a period of three (3) months after the date on which the Employee first becomes unable to perform his services hereunder. In the event that the Employee commences to receive benefits under any disability income policy maintained by the Employer for which he is qualified prior to the expiration of the three (3) month period referenced in this subsection, the amounts paid by the Employer under this subsection shall be reduced by the amount of such benefits that the Employee receives prior to the expiration of such three (3) month period.

(f) **Vacation.** The Employee will be allowed three weeks of paid vacation each Calendar year. Each day missed for illness or personal reasons will count as one-half of a vacation day.

4. **Duties.** The Employee is engaged as a Managing Director of the Velocity Sports Performance operated by the Employer in North Carolina. The Employee shall report directly to the Chief Executive Officer of the Employer. The Employee shall be one of two members of a Management Committee, which will be set up by the Executive Committee of the Employer, and initially shall include the Employee, and the Chief Executive Officer of the Employer.  All decisions shall be made unanimously by the Management Committee. The Employee shall devote his best efforts to the performance of his duties hereunder, and shall perform such duties that are consistent with aforesaid position as may be reasonably assigned to him. The Employee agrees to render his services under this Agreement faithfully and to the best of his abilities and in conformance with all laws and the Employer's rules and policies. The Employee represents to the Employer that the Employee is not in any way limited by the terms of any restrictive covenant obligations restricting the Employee's ability to transact business on behalf of the Employer with previous business customers or contacts as a result of the Employer's prior employment.

5. **Extent of Services**. During the Employment Period, and subject to the provisions of Section 8 of the Agreement, the Employee shall be able to pursue outside activities that specifically are approved by the Employer in writing prior to the commencement of such activities. Employer hereby approves Employee's business activities pertaining to Troutman Tennis Services.  The Employee may, however, (i) invest his assets (as restricted by the Employer's Insider Trading Policies, Personal Trading Policies and Code of Ethics) in such form or manner as will not require his services in the operation of the affairs of the companies in which such investments are made, (ii) engage in a reasonable number of speaking activities for which he shall be entitled to keep any honoraria paid to him, and (iii) participate in reasonable pro bono, public interest, charitable, volunteer, or political activities of his choice, provided such activities do not interfere with his responsibilities hereunder.

6. **Working Facilities.** During the Employment Period, the Employee shall be provided secretarial help and such other facilities and services suitable to his position and adequate for the performance of his duties. The Employee shall perform his duties under this Agreement from such locations as technology and job demands permit, with the approval of the Employer.

7. **Termination.** Notwithstanding the provisions of Section 2 above, the Employee's employment under this Agreement and the Employment Period hereunder shall terminate on the earliest of the following dates:

(a) **By Reason of Death.** On the date of the Employee's death. If the Employee dies during the Employment Period, the Employer shall pay to the estate of the Employee any earned but unpaid Incentive Compensation as defined by Section 3(b) as of the date on which the death occurs. The Employment Period shall terminate automatically upon the death of the Employee.

(b) **By Reason of Permanent and Total Disability.** On the date specified in a written notice from the Employer terminating the Employee's employment due to Permanent and Total Disability, or in the event no date is specified in the notice, on the date on which the notice is delivered to the Employee. In the event of the Permanent and Total Disability (as hereinafter defined) of the Employee, the Employer, in its sole discretion, may elect either (i) to the extent feasible and consistent with the Employee's mental and physical condition, to reassign the Employee to other duties within the Employer that the Employee is able to perform despite his Permanent and Total Disability at the compensation and benefit levels commensurate with the Employee's reassigned duties, or (ii) to terminate this Agreement and the Employee's employment hereunder. In the event the Employer elects to reassign the Employee to other duties pursuant to clause (i) above, then, in his sole discretion, the Employee may terminate this Agreement by the delivery of written notice to the Employer, in which event the Employee will be treated as though the Employer had elected to terminate this Agreement pursuant to clause (ii). In the event that the Employer terminates the Employee as provided in clause (ii) above, the Employer's obligations under this Agreement shall terminate and the Employer shall pay to the Employee any earned but unpaid Incentive Compensation as defined by Section 3(b). In addition, the Employee shall be eligible to receive the Disability Benefit in accordance with the provisions of Section 3(e). For the purposes of this Agreement, "Permanent and Total Disability" means an illness, injury or other physical or mental condition continuing for at least 180 consecutive days that results in the Employee's inability to provide in all material respects the duties theretofore performed by him under this Agreement, as determined in good faith by the Employer.

(c) **For Cause.** On the date of delivery of a notice from the Employer terminating the Employee's employment for Cause. For purposes of this Agreement, "Cause" shall mean (i) Employee's committing a material breach of the terms and conditions of this Agreement, which is not corrected within 30 days of written notice from Employer that such breach has occurred, such notice to specifically identify the claimed breach; (ii) Employee's engaging in serious misconduct in the discharge of his duties to the Employer; (iii) the Employee's engaging in a substantial and continuing refusal to perform his duties to the Employer (such duties to include without limitation, contractual, statutory or common law duties to the Employer), which is not corrected within 30 days of written notice from the Employer that such refusal has occurred, such notice to specifically identify the claimed refusal; (iv) Employee's being guilty of dishonesty or any substantial misconduct which reflects adversely on the Employer; (v) Employee's arrest for, indictment for, or being formally charged with, the commission of a felony or commission of a crime, whether or not a felony, involving the Employee's duties for the Employer or that may reflect unfavorably on the Employer or bring the Employee into public disrepute or scandal; (vi) Employee's violation of federal, state or local income tax laws; (vii) Employee's theft, misappropriation, embezzlement or conversion of the assets or opportunities of the Employer; or (viii) a material breach of the terms, covenants or representations of this Agreement. In the event of the termination of the Employee's employment for Cause pursuant to this Section 7(c), the Employee shall receive no further payments from the Employer of any kind.

(d) **For Reasons Other Than Cause.** On the date of delivery of a notice from the Employer terminating the Employee's employment for reasons other than Cause. In the event the Employer serves such notice, the Employee, if requested by the Employer, shall continue to render services for a period not to extend more than sixty (60) days after such termination notice is delivered and shall be paid his regular compensation up to the date of termination. If the Employer terminates the Employment Period pursuant to this Section 7(d), then there shall be paid to the Employee a severance allowance (the "Severance Payment") in the form of (i) salary payments as specified in Section 3(a) that would be earned and payable to the Employee had the Employee continued his employment with the Employer for a period of six (6) months; (ii) continuation of the Incentive Compensation as specified in Section 3(b) that would have been earned and payable to Employee with respect to the business of the Unit had the Employee continued his employment with the Employer for a period of

three (3) months following such termination; and (iii) to the extent allowed under the terms of the plans and under applicable law, benefits specified in Section 3(d) for a period of three (3) months following such termination. In the event it is determined by arbitration under Section 13 that the Employee has breached in any respect his obligations under Section 8 hereof, whether before or after termination of employment, then the Employee shall return any Severance Payment paid to him.

(e) **By Employee For Good Reason.** On the date specified in a written notice from the Employee to the Management Committee resigning the Employee's employment with the Employer for Good Reason in accordance with the provisions of this Section 7(e). The Employee may terminate his employment hereunder for Good Reason by written notice to the Employer in the event that without the Employee's written consent, the Employer materially breaches this Agreement, provided that the Employee shall not terminate his employment hereunder unless he has first given the Employer notice in writing specifying the facts and circumstances claimed by him to provide grounds for termination of his employment pursuant to this Section 7(e) and the Employer has failed to remedy or cure the same within 30 days (or if such remedy or cure requires more than 30 days to make a good faith start at such remedy or cure within 30 days) of its receipt of such notice. Any termination of employment under this Section 7(e) shall be deemed to be on account of "Good Reason." Termination by the Employee of his employment hereunder shall be deemed to be termination by the Employer under Section 7(d) (determined on the basis of the date on which the Employee terminates his employment), and the Employee shall be entitled to the Severance Payment. In the event it is determined by arbitration under Section 14 that the Employee has breached in any respect his obligations under Section 8 hereof, whether before or after termination of employment, then the Employee shall return any Severance Payment paid to him.

(f) **By Employee For Other Than Good Reason.** On the date specified in a written notice from the Employee to the Employer resigning the Employee's employment with the Employer. The Employee may terminate this Agreement and the Employment Period at any time. The Employee shall provide at least 30 days' written notice of intention to terminate pursuant to this subsection. In the event that the Employee terminates his employment pursuant to this Section 7(f), the Employer shall pay the Employee only such Incentive Compensation as had been earned but unpaid as of the date of the termination and the Employee shall receive no further payments of any kind except as may be required under the terms of the Employer's employee benefit plans. Following the termination of the Employment Period and the Employee's employment under this Agreement, the Employer will have no further liability to the Employee and no further payments will be made to the Employee, except as provided in Sections 7(a) through 7(e) above or as otherwise provided under any of the Employer's employee benefit plans.

8.   **Restrictive Covenants.**

(a) **Confidentiality.** The Employee acknowledges and agrees that his employment will involve exposure and access to highly confidential and sensitive areas of the Employer's professional service business, including, without limitation, proprietary information relating to the Employer's relationships with its clients, costs and prices for providing services to its clients, client budgets and needs, and other data and information which are confidential to the Employer, and which have not been disclosed by the Employer to others or been published ("Proprietary Information"). The Employee shall use his best efforts to protect from disclosure to persons not authorized to receive such information all Proprietary Information, which comes to the attention of the Employee while employed by the Employer. The Employee shall not at any time during employment or thereafter, regardless of the reason for which the Employee's employment terminates, use (i) Proprietary Information in any manner or (ii) disclose or make Proprietary Information available, directly or indirectly, to any other person, including specifically competitors, government employees, or members of the news media. Immediately upon termination of the Employee's employment or at any other time upon the Employer's request, the Employee will return to the Employer all memoranda, notes and data, and computer software and hardware, records or other documents compiled by the Employee or made available to the Employee during the Employee's employment with the Employer concerning the business of the Employer, all other confidential information and all personal property of the Employer, including without limitation,

all files, records, documents, lists, equipment, supplies, promotional materials, keys, phone or credit cards and similar items and all copies thereof or extracts therefrom.

(b) No Solicitation of Employees. The Employee agrees that, both during the Employment Period and for a period of six (6) months following the termination of the Employee's employment with the Employer under Section 7(b), 7(c) or 7(f) or due to the expiration of this Agreement without an agreement to continue employment, the Employee will not, directly or indirectly, on behalf of himself or any other person or entity, hire or solicit to hire for employment or consulting or other provision of services, any person who is actively employed (or in the preceding twelve (12) months was actively employed) by the Employer. If the Employee's employment with the Employer is terminated under Sections 7(d) or 7(e), the Employee will not, directly or indirectly, on behalf of himself or any other person or entity, hire or solicit to hire for employment or consulting or other provision of services, any person who is actively employed (or in the preceding twelve (12) months was actively employed) by the Employer for so long as Employee shall collect severance payments under Sections 7(d) or 7(e). This includes, but is not limited to, inducing or attempting to induce, or influencing or attempting to influence, any person employed by the Employer to terminate his or her employment with the Employer. The Employee recognizes that the employees of the Employer are assets of the Employer which have been obtained through the efforts of the Employer.

(c) No Solicitation of Clients. The Employee agrees that, both during the Employment Period and for a period of six (6) months following the termination of the Employee's employment with the Employer under Sections 7(b), 7(c) or 7(f) or due to the expiration of this Agreement without an agreement to continue employment, the Employee will not directly or indirectly, on behalf of himself or any other person or entity that operates as a Competitor (as that term is defined in subsection (d) below), solicit the business of any entity with whom the Employer has established as a Client or customer (a "Client" is defined as a person or entity that has paid the Employer investment management fees in the six (6) month period preceding the Employee's termination of employment). If the Employee's employment with the Employer is terminated under Sections 7(d) or 7(e), the Employee will not directly or indirectly, on behalf of himself or any other person or entity that operates as a Competitor (as that term is defined in subsection (d) below), solicit the business of any entity with whom the Employer has established as a Client or customer (as defined herein) for so long as the Employee shall collect severance payments under Sections 7(d) or 7(e). The Employee recognizes that the clients of the Employer are assets of the Employer that have been obtained through the efforts of the Employer.

(d) Non-Competition. The Employee agrees that both during the Employment Period and for a six (6) month period (the "Restricted Period") following the termination of his employment under Sections 7(b), 7(c) or 7(f) or due to the expiration of this Agreement without an agreement to continue employment, the Employee shall not, directly or indirectly, own, manage, operate, control, be employed by, participate in or be connected in any manner with the ownership, management, operation or control of any business, partnership, corporation, association, or other organization in any business engaged in the business of managing, and providing advice on the management of, financial assets for institutional and individual clients, including, but not limited to, publicly traded equities and fixed income securities, various hedge fund strategies, alternative and private equity investments and other investment related services and performing investment advisory services in the market sectors in which the Employer provides such services to any existing Client or customer (a "Competitor"). If the Employee's employment with the Employer is terminated under Sections 7(d) or 7(e), the Employee shall not, directly or indirectly, own, manage, operate, control, be employed by, participate in or be connected in any manner with the ownership, management, operation or control of any business, partnership, corporation, association, or other organization in any business engaged in the business of managing, and providing advice on the management of, financial assets for institutional and individual clients, including, but not limited to, publicly traded equities and fixed income securities, various hedge fund strategies, alternative and private equity investments and other investment-related services and performing investment advisory services in the market sectors in which the Employer provides such services to any existing Competitor, as defined herein, for so long as the Employee shall collect severance payments under Sections 7(d) or 7(e).

(e) **Enforcement.** The Employee acknowledges and agrees that the services to be provided by him under this Agreement are of a special, unique and extraordinary nature. The Employee further acknowledges and agrees that the restrictions contained in this Section 8 are necessary to prevent the use and disclosure of confidential information and to protect other legitimate business interests of the Employer. The Employer acknowledges that all of the restrictions in this Section 8 are reasonable in all respects, including duration, territory and scope of activity.  The Employee agrees that the restrictions contained in this Section 8 shall be construed as Separate agreements independent of any other provision of this Agreement or any other agreement between the Employee and the Employer. The Employee agrees that the existence of any claim or cause of action by the Employee against the Employer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Employer of the covenants and restrictions in this Section 8. The Employee agrees that the restrictive covenants contained in this Section 8 are a material part of the Employee's obligations under this Agreement for which the Employer has agreed to compensate the Employee as provided in this Agreement. The Employee agrees that the injury the Employer will suffer in the event of the breach by the Employee of any clause of this Section 8 will cause the Employer irreparable injury that cannot be adequately compensated by monetary damages alone. Therefore, the Employee agrees that the Employer, without limiting any other legal or equitable remedies available to it, shall be entitled to obtain equitable relief by injunction or otherwise from any court of competent jurisdiction, including, without limitation, injunctive relief to prevent the Employee's failure to comply with the terms and conditions of this Section 8. The six (6) month period referenced in Sections 8(b) through 8(d) above shall be extended on a day-for-day basis for each day during which the Employee violates the provisions of Sections 8(b) through 8(d) in any respect, so that the Employee is restricted from engaging in the activities prohibited by Sections 8(b) through 8(d) for the full six (6) month period, as applicable. In the event the Employee breaches any of the provisions of this Section 8, the Employer's obligation to make any further payments to the Employee under the provisions of Section 7 of this Agreement shall cease.

(f) **Non-Disclosure.** Except as may be required by law, neither the Employee nor the Employer shall disclose the financial terms of this Agreement to persons not involved in the operation of the Employer and the Parties shall disclose the financial terms of the Agreement to those involved in the operation of the Employer only as needed to implement the terms of the Agreement or carry out the operations of the Employer. The above notwithstanding, the financial terms of the Agreement may be disclosed to: (i) the Parties' attorneys, accountants, financial or tax advisors, and any Clients, potential investors in or purchasers of the Employer, provided such persons agree not to disclose such terms of the Agreement further; and (ii) members of the Employee's immediate family, provided such family members agree not to reveal the terms of the Agreement further.

9. **Notices.** All notices and other communications required or permitted to be given under this Agreement shall be in writing and delivery shall be deemed to have been made (i) three (3) business days following the date when such notice is deposited in first class mail, postage prepaid, return receipt requested; or (ii) the business day following the date when such notice is deposited with any overnight air courier service to the Party entitled to receive the same, at the address indicated below or at such other address as such Party shall have specified by written notice to the other Party given in accordance with the terms of this Section 9:

If to the Employer

SJK Special Opportunities Fund, LP
303 Pisgah Church Road
Suite 2-C
Greensboro, NC 27455
Attention: Stan Kowalewski

If to the Employee:

Mark Troutman
724 Florham Dr
High Point, NC 27262

10. **Waiver or Modification**. Any waiver by the Employer or the Employee of a breach of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any other breach of such provision of this Agreement. The failure of the Employer or the Employee to insist on strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive the Employer or the Employee of the right thereafter to insist on strict adherence to that term or any other term of this Agreement. Neither this Agreement nor any part of it may be waived, changed or terminated orally, and any waiver, amendment or modification must be in writing signed by the Employee and the Management Committee of the Employer.

11. **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall, when executed, be deemed to be an original and all of which shall be deemed to be one and the same instrument.

12. **Successors and Assigns**. The Employee acknowledges that the services to be rendered by him are unique and personal. Accordingly, the Employee may not assign any of his rights or delegate any of his duties or obligations under this Agreement. In the event of a merger, consolidation or other transfer of this Agreement by operation of law, or a sale of substantially all of the assets of the Employer, then the rights and obligations of the Employer under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Employer.

13. **Arbitration**. Any dispute arising under the terms of this Agreement, or otherwise affecting the rights and duties of any party hereto shall be resolved by arbitration in accordance with the rules of the American Arbitration Association. Such arbitration shall be held in Greensboro, NC. Any decision rendered in arbitration pursuant to this agreement may be entered as judgment by any court of competent jurisdiction, and such judgment may be enforced in accordance with law.

14. **Attorneys' Fees and Litigation Expenses**. Any party who prevails in an arbitration or other proceeding to enforce or for breach of this Agreement shall be entitled to recover the attorneys' fees, litigation expenses and other costs incurred by that party in conjunction with the proceeding.

15. **Entire Agreement**. This Agreement contains the entire understanding of the Parties relating to the subject matter of this Agreement and supersedes all other prior written or oral agreements, understandings or arrangements between the Parties relating to the subject matter hereof, including but not limited to any prior employment agreements. The Employee and the Employer acknowledge that, in entering into this Agreement, they do not rely and have not relied on any statements or representations not contained in this Agreement.

16. **Severability**. Any term or provision of this Agreement that is determined to be invalid or unenforceable by any court of competent jurisdiction in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction and such invalid or unenforceable provision shall be modified by such court so that it is enforceable to the extent permitted by applicable law.

17. **Legal Counsel**. The Employee and the Employer acknowledge that this is a legally binding contract and acknowledge and agree that they have had the opportunity to consult with legal counsel of their choice in connection with the drafting, negotiation and execution of this Agreement.

18. **Indemnification**. The Employer shall take all reasonable actions to ensure that the Employee is covered under the terms of any directors and officers liability insurance coverage that the Employer maintains with respect to other management level employees of the Employer with comparable areas of business responsibility.

19. **Governing Law**. This Agreement has been made under and shall be governed by the laws of the State of North Carolina.

20. **Headings**. The headings of any Sections in this Agreement are for reference only and shall not be used in construing the terms of this Agreement.

21. **No Third Party Beneficiaries**. This Agreement does not create, and shall not be construed as creating any rights enforceable by any person not a Party to this Agreement.

22. **Survival**. The covenants, agreements, representations and warranties contained in this Agreement shall survive the termination of the Employment Period and the Employee's termination of employment with the Employer at any time and for any reason.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

The Employer:                                     The Employee:

Stanley Kowalewski                                Mark Troutman
Chief Executive Officer
SJK Investment Management LLC

Schedule 4.3(a)(i)
Bill of Sale

See attachment hereto.

## BILL OF SALE

THIS BILL OF SALE is made and effective as of the 1ˢᵗ day of September, 2010, by T&B SPORTS PERFORMANCE, LLC, a North Carolina limited liability company ("Seller"), to and for the benefit of SJK SPECIAL OPPORTUNITIES FUND, LP, a North Carolina limited partnership ("Purchaser").

### WITNESSETH:

WHEREAS, Seller and Purchaser are among the parties to that certain Asset Purchase Agreement dated on or about September 1, 2010 (the "Purchase Agreement");

NOW, THEREFORE, in accordance with the terms and subject to the conditions contained in the Agreement and for good and valuable consideration paid by Purchaser to Seller as recited in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, Seller has sold, assigned and transferred and by these presents does hereby sell, assign and transfer to Purchaser the Assets (as defined in the Purchase Agreement), free and clear of all liens, claims, and encumbrances, and Seller hereby guarantees that Purchaser will receive good and marketable title to the Assets pursuant to this Bill of Sale,

TO HAVE AND TO HOLD the Assets unto Purchaser and Purchaser's successors, assigns, and heirs forever.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the date first above-written.

T&B Sports Performance, LLC

By: _Mark Troutman_
Name: _MARK Troutman_
Title: _Business Manager_

### Schedule 4.2(a)(iv)
### Assignment and Assumption Agreement

See attachment hereto.

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is made and entered into effective as of the 1st day of September, 2010, by and between T&B SPORTS PERFORMANCE, LLC, a North Carolina limited liability company ("Assignor"), and SJK SPECIAL OPPORTUNITIES FUNDS, LP, a North Carolina limited partnership ("Assignee").

### WITNESSETH:

IN ACCORDANCE with the terms and provisions of that certain Asset Purchase Agreement dated on or about September 1, 2010, the parties to which include Assignor and Assignee (the "Purchase Agreement"), and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound:

1.  Capitalized terms not otherwise used herein shall have the meanings ascribed to them in the Purchase Agreement.

2.  Assignor does hereby sell, assign, and transfer to Assignee, and Assignee does hereby assume and accept from Assignor all of the Assets.

3.  Assignee does hereby assume all liabilities and obligations of Assignor arising with respect to the agreement(s), if any, identified in Exhibit A attached hereto and incorporated herein by reference, but only to the extent arising with respect to the period commencing on the Closing Date, and hereby agrees to indemnify, defend, and hold harmless Assignor with respect to such assumed liabilities and obligations.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment and Assumption Agreement as of the date first above-written.

T&B Sports Performance, LLC

By: _Mark Troutman_
Name: MARK Troutman
Title: Business Manager

SJK Special Opportunities Fund, LP

By: _SJK_
Name: Stan Kowalewski
Title: General Partner

Exhibit A

Highwoods Lease